# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
November 7, 2000 Session

## STATE OF TENNESSEE v. CRISS WILLIAMS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-07226     Chris Craft, Judge**

---

**No. W1999-00823-CCA-R3-CD  - Filed March 9, 2001**

---

A Shelby County jury convicted the Defendant, Criss Williams, of the second degree murder of Jerry Washington.   Subsequently, the trial court sentenced the Defendant to twenty-five years of incarceration.   The Defendant challenges his conviction arguing that (1) the evidence was insufficient to convict him, because the state failed to prove his identity as the shooter, and (2) that the trial court erred in not granting his Motion for Judgment of Acquittal.  After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

James V. Ball, Memphis, Tennessee, for the appellant, Criss Williams.

Paul G. Summers, Attorney General & Reporter; Lucian D. Geise, Assistant Attorney General; William L. Gibbons, District Attorney General; and Glenn C. Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On February 16, 1997, Jerry Washington (the victim) attended Prentiss on the Hill nightclub in Memphis, Tennessee with his cousin, Donald Taylor, and Taylor's friend, Brandon Hawkins.  The three drove Taylor's 1986 Explorer to the nightclub and arrived at approximately 11:00 p.m.  Taylor testified that sometime before the club's normal closing hour, he walked out to his truck and waited for Washington and Hawkins.  As Taylor waited, he saw Washington hurriedly walking toward the truck.  Washington got in the vehicle and sat in the passenger seat.  Taylor attempted to leave, but a car was blocking him from the rear.  Shooting erupted, but Taylor testified that he did not hear the first shot, but he saw people getting down, which made him open his door and get down on the ground.  Washington remained in the truck, but Taylor did not know what had happened to Washington until the shooting stopped.  As Taylor stood up, he noticed that the right rear passenger

window of his truck was busted and Washington was sitting up and looking out of the sun roof. Taylor testified that Washington was not saying anything, but he was breathing and his eyes were open. Taylor did not see any blood, until he moved Washington's jacket. Taylor did not see who fired the shots and did not know exactly how many shots were fired.

On cross-examination, Taylor testified that, on the night of the shooting, the club parking lot was not lit and approximately 500 to 800 people were at the club. Also, Taylor testified that he was aware that Washington's car had been shot-up about a month before this shooting , but Taylor was not aware of the details surrounding that incident.

Officer Mervin Jones testified that he was patrolling the area surrounding Prentiss on the Hill, at approximately 3:00 a.m., when he heard shots fired. Due to the number of people at the club, Officer Jones could not drive his patrol car up to the club, so he responded on foot. A club security guard told him that the perpetrator had run through the parking lot of the bank next door. Officer Jones attempted to pursue the suspect, but was unable to catch him. Then, the security guard informed Officer Jones that a passenger in a two-tone Eddie Bauer Ford Explorer had been shot. Officer Jones radioed the police dispatcher and asked for an ambulance.

Willie Farrow testified that he was at Prentiss on the Hill on the night of the shooting. Farrow stated that he was in the lobby of the club, when two men walked by him and Farrow heard one man say, "I'm fixing to kill this n----r." At that point, Farrow and his friend decided to leave the club. Approximately three to four minutes later, Farrow was walking out of the club when he saw a young man with a gun in his hand come from behind a Ford Explorer and shoot the passenger sitting in the Explorer. In court, Farrow identified the Defendant as the man who had made the previous statement. Farrow told the jury that, at the time of the shooting, the Defendant's hairstyle was a jheri curl and Defendant's hair was long. Farrow further stated that, on that night, the Defendant was with two other men, who had on  top hats and dress clothes. Farrow also testified that the Defendant and the other man the Defendant spoke to, looked like brothers or cousins, but the other man was taller and darker than the Defendant.

Farrow further testified that he was no more than 15 to 20 feet away from the Defendant when the shooting started. He explained that the lighting in the parking lot of the club was decent, which permitted him to see that the Defendant had a long gun and that the Defendant shot into a Ford Explorer. Farrow testified that after the shooting, the Defendant got into a "burgundy-like" car with a light-skinned lady, but when the car could not leave the parking lot, the Defendant got out of the car and ran. Two days later, Farrow gave the police a statement and picked the Defendant's picture out of a photo line-up. Farrow identified the Defendant as, "B.M., . . .  33, brown complexion, . . . about six feet, 190/200 pounds.  He's built. Jheri curled . . . "

Frederick Hayes testified that, on the night of the shooting, he was working as a security guard in the parking lot at Prentiss on the Hill. Hayes stated that he saw the Defendant, Defendant's brother, another male and a female arrive at the club in a beige and maroon or burgundy Chrysler convertible. Later, the Defendant walked by Hayes with a brownish and wooden-like object hidden

under a green and beige jacket. Based upon the top of the object, Hayes thought it was a baseball bat, but was not alarmed by Defendant's appearance, because Defendant's brother also worked security at the club. Hayes also testified that the distinguishing factor between the Defendant and his "twin-like" brother was the length of their hair, because the Defendant had longer and stringier hair.

Hayes further testified that, as the club was closing around 3:00 a.m., he saw the Defendant pull a gun from his coat and five or six seconds later, he heard two shots fired. After two shots were fired, Hayes saw the Defendant running through the parking lot with a long-barreled gun in his hand. Hayes pointed the responding officers in the direction in which he saw the Defendant fleeing. The next day, Hayes gave the police a statement and identified a photograph of the Defendant from a photo lineup. Hayes also admitted that he was nearsighted and could not remember if he was wearing his glasses, contact lenses, or neither, on the night of the shooting. Hayes also denied having any type of confrontation with the Defendant several years earlier at a different club.

Officer Robert G. Moore testified that he collected evidence and took photos of the crime scene involved in this case. He testified that the police recovered a loaded "SKS 7.62" assault rifle from behind the vacant service station located next to the club. They also recovered a spent bullet from the dashboard of the Explorer, a spent bullet from the ambulance and a bullet from Washington's body. The parties stipulated that the spent bullet recovered from the dashboard of the vehicle had been fired through the barrel of the Norinco 7.62 X 39 SKS rifle found at the crime scene. However, the bullet from the victim's body was too damaged to be of value for comparison. Officer Shan Allen Tracy testified that he brushed the Explorer and the rifle for fingerprints. Officer Tracy found no prints on the rifle, but found a print on the rifle's magazine. The parties stipulated that prints processed from the magazine of the rifle were of no value for comparison. Additionally, Dr. Wendy Gunther, a medical examiner and forensic pathologist, testified that the victim's body had two gunshot wounds--one in the back and one in the chest. The gunshot in the victim's back was the fatal wound.

The State then rested its case-in-chief.

Antonious Beaty testified for the defense. He stated that, on February 14, 1997 (the Friday before the shooting), he gave the Defendant a haircut, which left the Defendant bald. Beaty told the jury that it was his practice to only cut hair on Fridays. He also testified that the Defendant asked him to testify, and that Defendant had reminded him of the month and day that he cut the Defendant's hair. He further admitted that he was drinking on the day he cut the Defendant's hair. However, he stated that he "vividly" recalled cutting the Defendant's hair on that day.

Tarsha Echols testified that she and the Defendant were dating at the time of this incident. She testified that, on the night of February 15, 1997, the Defendant called her at approximately 11:30 p.m. Later, the Defendant called Echols at 3:19 a.m. from the Discovery Inn. Echols acknowledged that she did not speak with the Defendant when he called the second time, however her caller I.D. box displayed the time and place of the call. Echols told the jury that she assumed the last call was

from the Defendant, because Defendant's earlier call had also come from the Discovery Inn. Echols further testified that the last time she saw the Defendant was Thursday, before the shooting, and the Defendant's hairstyle was a jheri curl with a V-shaped cut in the back.

Wayne Williams, the Defendant's younger brother, testified that he wears a little ponytail in the back of his head and has worn one for four years. He stated that, on the evening of the shooting, he rented a maroon and tan Chrysler convertible, which he drove to the club alone. He arrived at the club at 10:45 p.m. and saw Frederick Hayes, as he parked near the front of the club. About fifteen (15) minutes later, Wayne saw the Defendant (who was baldheaded from having his hair cut Friday) and the two talked briefly. Wayne did not see the Defendant again that evening. After the shooting, Wayne said he left the club alone and did not see his brother running on the club's parking lot. Also, Wayne testified he never saw the Defendant with an assault rifle. He further testified that neither he nor the Defendant were wearing top hats that night, and that he does not own a top hat. Wayne also testified that neither he nor the Defendant were wearing jackets that night.

The Defendant testified that, on Friday, February 14, 1997, Antonious Beaty shaved Defendant's head bald. On Saturday, Defendant got a room at the Discovery Inn. That night, Defendant drove to Prentiss on the Hill alone, in his 1985 Lincoln Continental and arrived between 10:00 and 10:15 p.m. Defendant parked in the Piggly Wiggly parking lot next to the club. While at the club, Defendant saw his brother Wayne and the two spoke briefly. Defendant stayed at the club for another 20 to 25 minutes and then left alone. He returned to his room at the Discovery Inn, called Tarsha Echols and then went to bed at approximately 11:35 p.m. During the night, Defendant was awakened by someone knocking on his window. He decided to call Echols at about 3:09 a.m., but she did not answer. On Sunday, Defendant checked out of the hotel and went to stay with a friend. On Monday, Defendant received a call from Wayne Williams, who stated that the police were looking for the Defendant. Defendant further testified that, on the night of the shooting, he was wearing brown corduroy pants, a sweater and a black flat leather hat. Defendant also testified that he did not know the victim and that he did not shoot the victim. Also, Defendant asserted that several years earlier, he and Frederick Hayes had a confrontation at another club, which led to a fist fight.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant contends that the evidence was insufficient to support his conviction for second degree murder. We disagree.

The proper inquiry for an appellate court determining the sufficiency of evidence to support a conviction, is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's

theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not reweigh or reevaluate the evidence. Id. Nor may this Court substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn.1985)). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Id.; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State on appeal is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences that may be drawn from the evidence. See Hall, 8 S.W.3d at 599; Bland, 958 S.W.2d at 659.

We find that the Defendant has failed to show that a rational trier of fact could not have found him guilty beyond a reasonable doubt of second degree murder. Tennessee Code Annotated section 39-13-210 (1997) defines second degree murder as a "knowing killing of another."

Before the State can convict a defendant, the law requires the State to prove beyond a reasonable doubt that the defendant was the person who committed the crime in question. State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995) (citing White v. State, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975)). Whether the State carried its burden of proof, as to the identity of the defendant, is a question of fact solely for the jury. See State v. Vaughn, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998), perm. to appeal denied (Tenn. 1999)).

The Defendant argues that the evidence preponderates against and is inconsistent with a conviction for second degree murder. The evidence here, when viewed in the light most favorable to the State, shows the following: 1) Willie Farrow saw the Defendant shoot the victim and then run, 2) Frederick Hayes saw the Defendant flee the scene of the crime with a long-barreled gun in his hand, 3) both Farrow and Hayes chose the Defendant from a photo line-up (which also included a picture of Defendant's brother) and 4) Farrow and Hayes gave similar descriptions of the car in which Defendant tried to escape.

The jury could have reasonably inferred from this evidence that the Defendant was at the scene of the crime, had a weapon and used that weapon to shoot the victim. Yet, the Defendant argues that his, Tarsha Echols and Wayne Williams' testimonies show that he was either not present during the shooting or that he was not the shooter, and that he had a bald head, not a jheri curl hairstyle as described by the State's two eyewitnesses. However, the jury chose to accredit the testimonies of Farrow and Hayes, and it found that the State had met its burden of proof in showing that the Defendant was the person who knowingly shot and killed the victim. "[T]he credibility of

the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact." State v. Cribbs, 967 S.W.2d 773, 793 (Tenn. 1998). We find that there was sufficient evidence from which a reasonable trier of fact could conclude that the Defendant knowingly shot the victim. Defendant is not entitled to relief on this issue.

## II. MOTION FOR JUDGMENT OF ACQUITTAL

Defendant contends that the trial court erred when it refused to grant his motion for judgment of acquittal. We disagree. When the trial court is presented with a motion for judgment of acquittal, the only concern is the legal sufficiency, as opposed to the weight, of the evidence. State v. Campbell, 904 S.W.2d 608, 611 (Tenn. Crim. App.1995) (citing State v. Hall, 656 S.W.2d 60, 61 Tenn. Crim. App. 1983)). "To determine whether the evidence is insufficient to sustain the conviction, the trial court must consider the evidence introduced by both parties, disregard any evidence introduced by the accused that conflicts with the evidence adduced by the State, and afford the State the strongest legitimate view of the evidence, including all reasonable inferences which may be drawn from the evidence." Id. at 611(Hall, 656 S.W.2d at 61). As discussed above, the evidence in this case was clearly sufficient to support Defendant's conviction. Thus, we conclude that the trial court properly denied the motion for judgment of acquittal.

For the foregoing reasons, the judgment of the trial court is AFFIRMED.

_____
THOMAS T. WOODALL, JUDGE